UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

SCOTT DENIS CRONIN,

                 Petitioner,                   Case No. 1:14-cv-860

v.                                    Honorable Robert J. Jonker

LORI GIDLEY,

                 Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner Scott Denis Cronin is incarcerated with the Michigan Department of Corrections at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan.  Following a jury trial in the Kalamazoo County Circuit Court, Petitioner was convicted of four counts of first-degree criminal sexual conduct (CSC I), involving a person under 13 years, Mich. Comp. Laws § 750.520b(1)(a), and four counts of CSC I, involving multiple variables, Mich. Comp. Laws § 750.520b.  On July 18, 2011, the court sentenced Petitioner to prison terms of 25 to 40 years on three of the four counts of CSC I involving a person under 13 years and 9 to 40 years on the remaining five counts of CSC I.

        On May 12, 2014, Petitioner filed his habeas corpus petition.  Under Sixth Circuit precedent, the application is deemed filed when handed to prison authorities for mailing to the federal court.  *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002).   Petitioner signed his application on May 12, 2014.  (Pet., ECF No. 1, PageID.8.)  The petition was received by the Court on August 13, 2014.  For purposes of this Report and Recommendation, I have given

Petitioner the benefit of the earliest possible filing date.  *See Brand v. Motley*, 526 F.3d 921, 925 (6th Cir. 2008) (holding that the date the prisoner signs the document is deemed under Sixth Circuit law to be the date of handing to officials) (citing *Goins v. Saunders*, 206 F. App'x 497, 498 n.1 (6th Cir. 2006)).

The petition raises two grounds for relief, as follows:

I.      The verdicts were against the great weight of the evidence.

II.     Denial of fair trial where [the] prosecution impermissibly bolstered credibility.

(Pet., ECF No. 1, PageID.6.)  Respondent has filed an answer to the petition (ECF No. 9) stating that the grounds should be denied because they are procedurally defaulted, noncognizable, or without merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are noncognizable, procedurally defaulted, and/or meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

### I.      Factual allegations

Petitioner's conviction arose out of his sexual abuse of his girlfriend's daughter, KN, beginning when she was 9 years old and continuing at least weekly for between five and six years.  At the time of trial, KN was 14 years old.

KN testified that her mother Shannon was married to an abusive husband, causing her mother to move out and move back many times over a period of years.  During this period, KN, her mother and KN's two younger sisters moved to many states, including California, Washington, Michigan, and Oklahoma, staying in shelters or living with other families.  (T. Tr. II, PageID.600-602.)  In April 2005, the family moved to Michigan to live with Rob Kane, a man

2

her mother had met online.  Kane lived in the same trailer park as Petitioner, and they were best friends.  (*Id.*, PageID.612.)  KN came to know Petitioner quite well, and Petitioner babysat KN and her sisters often.  (*Id.*, PageID.615.)  Kane's relationship with KN's mother was abusive, and KN saw her mother beaten and mentally abused regularly.  When the family was on a trip to Indiana during the summer of 2006, KN had a nervous breakdown and swallowed all of the pills she could find.  She was taken to the hospital where she had her stomach pumped.  (*Id.*, PageID.611, 613-614.)  When they returned to Michigan from Indiana, KN went to live with Petitioner, his fiancée, and his daughter (when she was there, every other weekend).  (*Id.*, PageID.611-612, 615.)  KN's mother returned to Indiana.  A few weeks later, during which Petitioner's fiancée moved out, KN's mother and sisters then moved into Petitioner's home, where they lived for the next five years.  (*Id.*, PageID.602, 216.)

The first sexual assault occurred during the weeks before KN's mother and sister joined her in Petitioner's home.  In the middle of one night, KN could not fall asleep.  She heard Petitioner in his office, and she got up to talk with him.  Petitioner placed KN on the desk and initiated penile-vaginal penetration, which caused her to bleed from her vagina.  Petitioner carried KN to the bathroom and helped her to clean herself and clean up the room, explaining that it was normal to bleed when something tears into you and that it would stop in a few minutes.  He told her not to tell anyone and that it was their secret, to which she "pinky promised."  (*Id.*, PageID.610-611, 617-621.)  She went back to bed and awoke unsure of whether it had happened or had been a dream.  She realized it had really happened when she saw blood on her legs and the floor.  (*Id.*, PageID.621-622.)

The second assault KN described occurred after her mother and sisters had moved in.  It was 2007, when KN was 11 years old.  KN went with Petitioner to his storage unit in

downtown Kalamazoo.  Petitioner took a mattress that was standing up along the wall of the unit, laid it on the floor of the unit, and had penile-vaginal sex with KN on the mattress.  KN indicated that, between the first and second events she described, Petitioner had had sex with her on multiple occasions, usually on the weekends or holidays such as his or her birthdays, because his work kept him too busy during the week.  (*Id.*, PageID.623-627.)  During this period, Petitioner frequently told KN that he would rather be with KN than her mother and that he could not wait until she was 18, when they could be together forever.  (*Id.*, PageID.629.)  She believed it was a loving relationship until she was in seventh or eighth grade, when she began to feel that her sexual relationship with Petitioner was disgusting and wrong.  But she did not tell her mother, because she was ashamed.  (*Id.*, PageID.630.)

KN described a third incident.  In 2007, when she was 11, Petitioner came into the bathroom while KN was taking a shower and joined her in the shower.  Petitioner pressed his penis into her "butt."  (*Id.*, PageID.634, 636.)  She did not like it and told him to stop.  Petitioner then put KN's conditioner on his penis and reinserted his penis into her anus.  She again complained that it hurt, so he withdrew.  Petitioner told her that he loved her and did not want to hurt her.  (*Id.*, PageID.636-637.)  KN testified that she believed that she was in a loving relationship with Petitioner because of what he told her and because he stopped whenever she told him it hurt.  (*Id.*, PageID.637-638.)

The fourth incident KN described was in 2008, when her mother and youngest sister went to Arizona to stay with her Uncle Shawn and Aunt Casey.  While KN's mother was gone, Petitioner would have KN sleep in bed with him.  (*Id.*, PageID.640-641.)  She had almost nightly penile-vaginal sex with Petitioner during the two months her mother was gone.  (*Id.*, PageID.660.)

KN described a fifth incident that also occurred during the two months her mother was gone.  One night shortly after KN's mother left, Petitioner locked the door to the bedroom. (*Id.*, PageID.643-644.)  Petitioner asked KN if she would "eat him," which she understood meant to suck his penis.  KN testified that she got on her knees and did what he asked, though she refused to allow him to ejaculate into her mouth because it was "nasty."  (*Id.*, PageID.645.)  This was the first time she had oral sex with Petitioner.  (*Id.*, PageID.646.)

The sixth specific incident KN specifically described occurred on March 11, 2010, on Petitioner's birthday.  Petitioner came to KN in the middle of the night and asked if KN would wish him a happy birthday.  (*Id.*, PageID.646.)  KN usually slept with one of her sisters or Petitioner's daughter, but they switched sleeping arrangements often, so KN was not sure who was there on the night in question.  Petitioner frequently came in, even when someone else was there.  Two mattresses were on the floor of the room, one queen size mattress from the bottom of a broken bunk bed, and one twin mattress that previously was the top of the bunk bed.  (*Id.*, PageID.647-648, 650.)  KN was in twin bed, and Petitioner joined her.  (*Id.*, PageID.647, 719-720.)  He performed penile-vaginal sex with her.  (*Id.*, PageID.647.)  KN was 13 at the time.  (*Id.*, PageID.649.)  KN testified that she had sex with Petitioner on his birthday every year from 2006 to 2010.  (*Id.*, PageID.650.)

KN testified to a seventh specific event at the trailer.  On her birthday in 2009, Petitioner came to her room and had penile-vaginal sex with her.  (*Id.*, PageID.649.)

In March 2010, Petitioner and KN's family were evicted from the trailer park. KN went to her friend Elena's house, and Petitioner and the others moved into Charles Townsend's home.  After spring break ended, KN joined the family at Townsend's house.  The eighth incident KN described occurred in the Townsend house.  KN slept in the basement with

her sisters, while Petitioner and her mother slept in an upstairs bedroom.  (*Id.*, PageID.650-651.)

The basement contained a family room, a bathroom and two bedrooms.  Her sisters slept in one

bathroom, Townsend's nephew slept in the other, and KN slept in the family room most of the

time.  (*Id.*, PageID.651.)  KN testified that Petitioner came downstairs one night.  She knew what

he wanted.  They laid on the floor, behind the sofabed, but then moved to the mattress.  Petitioner

for the second time performed penile-anal sex on KN.  (*Id.*, PageID.652-653.)

KN testified that after she became unhappy with continuing to have sex with

Petitioner, she would repeatedly ask if they could stop doing it.  Petitioner always stated, "one

more time, let's just do it one more time."  (*Id.*, PageID.655.)  Eventually, KN got tired of asking

him to stop and just ceased asking.  (*Id.*)

KN described a ninth incident, which also occurred at the Townsend house.  She

and Petitioner were upstairs, and her mother was in the basement watching television with her

sisters.  KN was scheduled for a physical in a few days, and Petitioner was worried that she might

be pregnant, because she had not had her period.  Petitioner asked KN if there was anyone he

could blame a pregnancy on.  She was outraged, because she thought he knew that he was the

only person she had had sex with.  (*Id.*, PageID.655.)  After she told him that he was the only

one, he locked the door and they had penile-vaginal intercourse on the bed.  (*Id.*, PageID.656.)

Not long after this incident, she got her period, which she told Petitioner.  (*Id.*, PageID.657.)  She

went for her physical a few days later, at which the doctor performed a routine examination,

checked the curvature of KN's spine, and explained certain parts of puberty.  (*Id.*, PageID.658-

659.)

KN reported a conversation she had with Petitioner about their relationship when

she was 13.  She made Petitioner promise that he was not doing the same things to her sisters,

6

and she said it did not matter about her, as long as he was not doing it with her sisters. (*Id.*, PageID.660-661.) According to KN, Petitioner used condoms only irregularly. She testified that he kept condoms in his closet, in his drawer, in her closet, and on the door molding. (*Id.*, PageID.663.)

In sixth grade, KN told her best friend, Helen Rhinehower, about the sexual abuse. KN would tell Helen, whether on the phone or in person, each time a sexual assault happened. They always referred to the abuse as "nightmares" in case someone overheard. (*Id.*, PageID.666.) Helen told her father and stepmother. Helen's father once asked KN about the sexual assaults, but KN denied that anything had happened and said that Helen had lied. KN stated that she wanted someone to talk to, but she did not want anyone to do something about it before she was ready. (*Id.*, PageID.666-667.) She avoided Helen's father after that.

During spring break of 2010, KN told her friend, Elena Thompson, about what Petitioner had done to her. KN told Elena that she was sick of it and wanted to run away or move in with Elena's family. The following day, they were talking about it while they were driving to Elena's grandmother's house. Elena's mother caught on and stated, "[Y]ou really need to tell somebody because that happened to me and it affects your life in a big way." (*Id.*, PageID.667.) KN made them promise that they would not tell anyone, and she stopped going over to their house after that. KN was ashamed and thought that they would look at her differently. (*Id.*, PageID.668.)

At the end of July of 2010, KN, her mother, and Petitioner travelled to Oklahoma, because KN's grandfather was dying. (*Id.*, PageID.602.) They arrived in very early August 2010, and she stayed with her mother's brother Shawn Silva until after the funeral and cremation. At that point, Petitioner and KN's mother travelled back to Michigan, but KN asked to stay in

Oklahoma with her uncle, his wife, and their young son.  She initially told her mother that she wanted to stay for a couple of weeks, and she made excuses for not wanting to go back, but the real reason she did not want to return was that she did not want to see or have sex with Petitioner again.  (*Id.*, PageID.603-604, 608-609, 669.)  While her mother and sisters were in Michigan, she disclosed Petitioner's conduct to David Taylor, her grandfather's former caretaker.  KN stated that she had learned that her mother let Petitioner take her sister to a doctor's appointment and, knowing that Petitioner was upset with her, KN was afraid for her sister.  She wanted someone to talk to, but she asked David not to tell anyone.  (*Id.*, PageID.669-670.)

Near the beginning of September, KN's mother returned to Oklahoma from Michigan, bringing her friend Melissa and Melissa's newborn, as well as KN's sisters.  (*Id.*, PageID.608-609, 670.)  At that time, KN believed her mother had moved to Oklahoma so the family could be together.  But her mother only stayed in Oklahoma for a month before moving to California with David, taking KN's sisters with her.  (*Id.*, PageID.603-604, 608-609, 745.)  During the middle of the month her mother was in Oklahoma, KN revealed to Melissa what Petitioner had done.  That night, Melissa apparently told KN's mother, who confronted KN the next morning.  KN then told her mother that Petitioner had been sexually abusing her.  (*Id.*, PageID.603-609, 670-671, 674.)

KN testified that she was really angry when Melissa told her mother.  KN had not wanted anyone to do anything, because she did not want people knowing what happened and she felt it was her fault.  She did not want to hurt her mother or to go through making police reports and going to court.  (*Id.*, PageID.674, 676.)

The prosecutor asked if KN had ever accused anyone else of sexual assault.  She stated that her mother had accused her former husband of assaulting KN.  KN had no memory of being assaulted, and she had never accused anyone else.  (*Id.*, PageID.672.)

KN testified that she had lived with her uncle and aunt since August 2010.  While she loved her mother and, in one way, would like to live with her, KN wanted the stability of being in the same place and having the same friends through high school.  (*Id.*, PageID.677.)

KN's testimony was corroborated in part by the testimony of her uncle, Shawn Silva, who confirmed that KN disclosed the abuse well before her mother expressed an intent to move to California.  (*Id.*, PageID.572.)  In addition, Silva testified to having witnessed Petitioner stroking KN's inner thigh in an inappropriate way, about which he confronted Petitioner.  Silva also testified that he witnessed Petitioner make inappropriate comments about KN in her bathing suit and witnessed Petitioner hug KN in an inappropriate manner.  (*Id.*, PageID.565-568.)  When Silva learned of KN's accusations, he took her to the police station.  (*Id.*, PageID.596-597.)

Martha Denney, a sexual assault nurse examiner, was qualified as an expert in sexual assault examinations.  (*Id.*, PageID.763-766.)  Denney remotely viewed KN's forensic interview and then examined KN on September 24, 2010.  (*Id.*, PageID.768.)  She conducted a genital examination, using a colposcope.  (*Id.*, PageID.772, 795.)  Denney found significant evidence that KN's hymen had been torn by blunt trauma sometime before her first menses.  (*Id.*, PageID.779-785.)

Therapist Connie Black-Pond testified as director of the Southwest Michigan Children's Trauma Assessment Center at Western Michigan University, who also had her own private treatment and consultation practice.  (*Id.*, PageID.806.)  Black-Pond testified as an expert in the assessment and treatment of children who have been sexually abused and/or traumatized.

9

(*Id.*, PageID.812.)  She did not testify as a treater of KN, but instead as an expert in the reasons children delay in disclosing, including shame, fear of being blamed, and belief in their own responsibility for the abuse.  (*Id.*, PageID.814.)  Victims often have ambivalent feelings about their assailants and are less likely to tell if the assailant is a family member and if the abuse has gone on for a long time. (*Id.*, PageID.816-818.)  Black-Pond also explained that, following initial disclosures of abuse, children may subsequently disclose further incidents or detail, which are generally reliable.  (*Id.*, PageID.852-853.)

Charles Townsend testified that Petitioner worked for him approximately 20 to 25 hours each week.  (*Id.*, PageID.867.)  When Petitioner lost his home, Townsend allowed Petitioner to move into his house in April 2010, with KN's family.  KN's family moved out in July 2010.  Petitioner's daughter also stayed at Townsend's house every other weekend.  (*Id.*, PageID.868-869.)  Townsend testified as to the layout of the house and the sleeping arrangements. (*Id.*, PageID.868-872.)  According to Townsend, he slept lightly when others lived in his house.  (*Id.*, PageID.871, 875.)  Noises carried in Townsend's home, due to the open stairway to the basement, the laundry chute that went from Townsend's bedroom to the basement utility room, and squeaky floors.  (*Id.*, PageID.872-875.)  Townsend testified that he did not remember ever hearing Petitioner leave his bedroom and go to the basement.  (*Id.*, PageID.871.)

Joann Holt testified that she was the caretaker for Petitioner's storage area.  (*Id.*, PageID.876-877, 879.)  Petitioner's unit was one of the larger units in the building at 30 feet by 30 feet.  (*Id.*, PageID.879-880.)  Each unit had side walls going floor to ceiling, and the front of the units had a ten-foot corrugated metal wall with a lockable door.  (*Id.*, PageID.881.)  Petitioner usually came to his unit with either his wife and the girls or some of the girls, but Holt did not remember seeing Petitioner with just one of the girls.  (*Id.*, PageID.882.)  She admitted, however,

that people did not need to come to her before entering their units, and people could access their units 24 hours a day, which she would not necessarily have heard or known about.  She also knew that Petitioner had come to his unit at night before.  (*Id.*, PageID.883-885.)  Holt acknowledged that Petitioner's unit had mattresses that usually were leaning up against the walls, but she saw them on the floor a couple of times when the girls visited, and they were easily accessible.  (*Id.*, PageID.884.)

The defense called a number of witnesses, including Petitioner's stepson, his former fiancée, some neighbors, and two experts.  Petitioner did not testify.  Petitioner's stepson, Abram LoBretto, testified that he never saw anything inappropriate about Petitioner's relationship to KN, though he lived in the mobile home for a year-and-a-half, beginning in the summer of 2008.  (*Id.*, PageID.908.)

Carrie Allers, Petitioner's former fiancée testified that she lived in the trailer for six months after KN's family moved in, including after KN's mother had taken Allers' place in Petitioner's bedroom.  (*Id.*, PageID.954.)  Allers acknowledged that she did not like the family being there, did not like the mother, did not like how the girls treated Petitioner's daughter when she was there, and did not like that they ate Allers' food.  (*Id.*, PageID.949, 951, 954-955, 963.)  She stated that KN had been dropped at the trailer on July 8, 2006.  On July 11, 2006, KN came to her to talk about being scared because she was bleeding vaginally.  (*Id.*, PageID.952.)  Allers gave KN a menstrual pad and explained that it was just what happened when a girl turned into a woman.  (*Id.*)  Allers also testified that KN told her that she had been abused by her stepfather.  (*Id.*, PageID.958.)  Allers acknowledged that she currently had a close relationship with Petitioner, spoke to him every couple of days, and had refused to talk with police about her testimony.  (*Id.*, PageID.965-966, 971-972.)

11

Dr. Stephen Guertin testified by videoconference.  (*Id.*, PageID.986.)  Dr. Guertin was Director of the Pediatric Intensive Care Unit at Sparrow Hospital in Lansing.  Guertin was qualified as an expert witness in the areas of general pediatrics and child abuse, including child sexual abuse.  (*Id.*, PageID.988, 992.)  Dr. Guertin testified that he had reviewed the DVD of the vaginal examination of KN.  Dr. Guertin concluded that some of the purported injuries testified to by Nurse Denney were normal.  The other two areas were suspicious of injury.  (*Id.*, PageID.993-994.)  But Guertin stated that the images did not provide a clear enough view to enable him to determine that they actually were injuries.  (*Id.*, PageID.996-1001.)

Dr. Katherine Okla, a clinical and forensic psychologist, testified to the Michigan interview protocol for interviewing children who are alleged to have been abused.  (T. Tr. IV, ECF No. 10-6, PageID.1053-1060.)  Dr. Okla was qualified as an expert in the areas of child clinical and forensic psychology, memory and suggestibility, and investigations of alleged sexual abuse, including forensic interviewing techniques.  (*Id.*, PageID.1066.)  Dr. Okla testified that most children, when asked about abuse, disclose.  (*Id.*, PageID.1069, 1071.)  According to Dr. Okla, cases of gradual disclosures occur after children have been repeatedly interviewed by adults.  (*Id.*, PageID.1072.)  Memory does not improve over time.  (*Id.*, PageID.1084-1085.)

On rebuttal, Dr. Colette Gushurst, a professor of pediatric medicine at Michigan State University testified as an expert in pediatrics and child abuse.  (T. Tr. III, ECF No. 10-5, PageID.1020-1027.)  Dr. Gushurst, unlike Dr. Guertin, had a child abuse pediatric certification and was a member of all of the professional organizations on child abuse.  (*Id.*, PageID.1003, 1023-1024.)  Dr. Gushurst testified that she disagreed strongly with Dr. Guertin's testimony about the ability to make a definitive finding on the images of the lacerations.  In particular, she identified one laceration as "dramatic," particularly given that most children, even with a history

of penetration, do not have any physical findings.  (*Id.*, PageID.1028, 1030.)  Dr. Gushurst agreed

with the nurse examiner that the injuries were evidence of penetration causing blunt force trauma.

(*Id.*, PageID.1031.)

   Also on rebuttal, Dr. James Henry, the Director of the Southwest Michigan

Children's Trauma Assessment Center, testified as an expert on child sexual abuse, child trauma,

child development, and child maltreatment.  (*Id.*, PageID.1116, 1120, 1122.)  Dr. Henry disputed

the accuracy of Dr. Okla's conclusions that adolescent children are highly suggestible; evidence

showed that adolescents are far less suggestible than researchers originally thought.  (*Id.*,

PageID.1125.)  He also disputed Dr. Okla's claim that children who disclose additional events

over time have usually been influenced by adult questioning.  Instead, such gradual disclosures

are common.  (*Id.*, PageID.1128.)  In addition, he disputed the primary reasons for recantation

and secrecy identified by Dr. Okla.  (*Id.*, PageID.1129-1131.)

   On June 21, 2011, the jury found Petitioner guilty on eight of the nine counts of

first-degree criminal sexual conduct.  The jury found Petitioner not guilty on count five, which

accused Petitioner of penile-vaginal sex at the storage unit in in 2007 on alternative bases.  (T.

Tr. V, ECF No. 10-7, PageID.1220-1221.)  On July 18, 2011, the court sentenced Petitioner on

counts 2, 3, and 4 to mandatory minimum sentences of 25 years and maximum sentences of 40

years.  On the remaining five counts for which the mandatory minimum did not apply, the court

sentenced Petitioner to minimum sentences at the bottom of the guidelines range, 108 months, to

maximum sentences of 40 years.  (Sentencing Tr., ECF No. 10-8, PageID.1244.)

   Petitioner appealed his convictions to the Michigan Court of Appeals, raising the

same two issues presented in this habeas petition.  In an opinion issued on October 2, 2012, the

court of appeals denied both claims and affirmed the convictions.  (Mich. Ct. App. Op., ECF No.

10-9, PageID.1247-1249.)   Petitioner filed a motion for reconsideration, which the court of appeals granted, issuing a revised opinion dated December 6, 2012.  (Mich. Ct. App. Rev. Op., ECF No. 10-9, PageID.1408-1410.)  Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same two issues.  The supreme court denied leave to appeal on June 21, 2013. (Mich. Order, ECF No. 1-5, PageID.120.)

## II.    AEDPA standard

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).   The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."    28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82;

14

*Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 417, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to

findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### III.   Ground I:  Great Weight of the Evidence

Petitioner argues that the jury's guilty findings were against the great weight of the evidence.  The assertion that the verdict was against the great weight of the evidence does not state grounds for habeas corpus relief.  The extraordinary remedy of habeas corpus lies only for a violation of the Constitution.  28 U.S.C. § 2254(a).  The Michigan courts apply the great-weight-of-the-evidence standard to determine whether to grant a new trial.  *See People v. Lemmon*, 576 N.W.2d 129, 137 (Mich. 1998).  This question is distinct from the due-process guarantee offended by insufficient evidence and "does not implicate issues of a constitutional magnitude."  *Id.* at 133 n.8.  As a consequence, a "weight of the evidence claim" is purely a matter of state law and is not cognizable on habeas review.  *See* 28 U.S.C. § 2254(a); *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with federal law that renders a state's criminal judgment susceptible to a collateral attack in the federal courts."); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ( "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").  Because this Court lacks authority to review a state court's application of its own law, the state-court determination that the verdict was not against the great weight of the evidence is final.

Moreover, Petitioner has never claimed, either in this Court or in the state courts that the evidence was constitutionally insufficient, under the standard of *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Indeed, in his briefing to the Michigan appellate courts, Petitioner expressly conceded that the evidence was constitutionally sufficient.  (*See* Pet'r's Br. on Appeal to Mich. Ct. App., ECF No. 10-9, PageID.1330; Pet'r's Appl. for Leave to Appeal to Mich.

Supreme Ct., ECF No. 10-10, PageID.1450.)   Petitioner therefore presents no constitutional issue.

## IV.    Ground IV:  Prosecutorial Misconduct

Petitioner argues that the prosecutor improperly bolstered KN's credibility by commenting during closing arguments that KN had "consistently" made the same allegations against Petitioner at various times prior to trial.  Specifically, Petitioner argues that the prosecutor made the following remark during closing argument:

> Katrina is not sophisticated enough to pull off this huge of a lie.  She's not.  **She told a consistent story**.  Defense counsel, Mr. Cronin would have you believe that she's so sophisticated, she can fool a SANE nurse, a police detective, a prosecutor, a jury of 14 people.  **She can maintain a story over a lengthy period of time, tell that same story and maintain that story.** They want you to believe that she's not only a liar, she's a darn good liar. She's not that sophisticated. (IV, 115-116).

(Pet'r's Br. on Appeal to Mich. Ct. App., ECF Nos. 1-1, 10-9, PageID.40, 1296 (emphasis added to brief).)  On rebuttal, the prosecutor made the following argument:

> What would a police officer have testified to?  Repeated what Katrina said.  You heard from Katrina herself.   Maybe refute something if she said something different.   Neither one of us called anybody to do that.  You heard from Katrina. You heard what she told.  **You heard she consistently told**.  Did we want officers to repeat hearsay?  Her word was the best evidence you could have had (IV, 137).

(*Id.* (emphasis added to brief).)  Petitioner contends that no evidence was introduced at trial about the substance of any out-of-court statements made by KN.   He therefore contends that the prosecutor's statements about KN's consistency are unsupported and amount to vouching.

In her answer, Respondent contends that the issue is procedurally defaulted, because the Michigan Court of Appeals analyzed the claim only for plain error, due to Petitioner's failure to lodge a contemporaneous objection.

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.

*See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To

determine whether a petitioner procedurally defaulted a federal claim in state court, the Court

must consider whether: (1) the petitioner failed to comply with an applicable state procedural

rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default

is an "independent and adequate" state ground properly foreclosing federal habeas review of the

federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord*

*Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v.*

*Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  In determining whether a state procedural rule was

applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing

of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner

must demonstrate either (1) cause for his failure to comply with the state procedural rule and

actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack

of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See*

*House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*,

377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary"

case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.

*House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish

that, in light of new evidence, it is more likely than not that no reasonable juror would have found

petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327

(1995)).

The Michigan Court of Appeals expressly relied on Michigan's contemporaneous

objection rule in denying Petitioner's claim.  The contemporaneous objection rule was well-

established at the time of Petitioner's trial.  *See, e.g.*, *People v. Stanaway*, 521 N.W.2d 557, 579 (Mich. 1994) (citing cases); *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985).  A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002).  Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).  Accordingly, review by this Court would ordinarily be barred unless Petitioner can show cause and prejudice or actual innocence.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485.

　　　　To show cause sufficient to excuse Petitioner's failure to make a contemporaneous objection, Petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal.  *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).  Petitioner does not even attempt to demonstrate cause.  In addition, although ineffective assistance of counsel may serve as cause to excuse a default in some cases, it may not do so in the instant case, because Petitioner has never exhausted a claim of ineffective assistance of counsel in the state courts.  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Because Petitioner fails to demonstrate cause, the Court need not consider prejudice.  *See Engle v. Isaac*, 456 U.S. at 107, 134 n.43; *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Moreover, while Petitioner has continuously claimed that he is innocent of the offenses, he utterly fails to present new evidence that makes it more

likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt within the meaning of *Schlup*, 513 U.S. 327.  As a consequence, Petitioner's prosecutorial misconduct claim is procedurally defaulted, barring this Court from granting relief on habeas review.

Even were his prosecutorial-misconduct claim not procedurally defaulted, however, Petitioner would not be entitled to relief, because his claim is meritless.  In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Prosecutors "must be given leeway to argue reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13; *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344

F.3d 487, 512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The federal courts have generally recognized two types of objectionable vouching. *See Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008); *Brown v. McKee*, 231 F. App'x 469, 478 (6th Cir. 2007) (citing *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)); *but see Wogenstahl v. Mitchell*, 668 F.3d 307, 328-29 (6th Cir. 2012) (treating the two aspects of vouching as part of a single standard).  The first type impermissibly places the government's prestige behind the witness to bolster the witness' credibility.  *Francis*, 170 F.3d at 550; *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992).  In the second type of impermissible vouching, also known as bolstering, the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See Francis*, 170 F.3d at 551; *United States v. Medlin*, 353 F.2d 789, 796 (6th Cir. 1965); *Henderson v. United*

*States*, 218 F.2d 14, 19 (6th Cir. 1955). [1] Petitioner argues the second type of vouching in the

instant case.

The Michigan Court of Appeals analyzed the issue, as follows:

> Prosecutorial misconduct occurs if a defendant is denied a fair trial, *People v Watson*, 245 Mich App 572, 586; 629 NW2d 411 (2001), and claims of prosecutorial misconduct are reviewed case by case, with the prosecutor's remarks evaluated in the context of the entire record, *People v Dobek*, 274 Mich App 58, 64; 732 NW2d 546 (2007). A prosecutor may argue the evidence and all reasonable inferences from the evidence. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). However, a prosecutor "may not argue facts not in evidence or mischaracterize the evidence presented." *Watson*, 245 Mich App at 588.
>
> Here, the prosecutor improperly argued that the victim's story remained consistent throughout the investigation and prosecution of this case. No testimony of record supported this, and the challenged comments were plain error. *Schumacher*, 276 Mich App at 177. However, we conclude this error does not require reversal because a timely instruction upon request could have cured any prejudice from the prosecutor's arguing of a fact not in evidence. *Watson*, 245 Mich App at 586. If a curative instruction could have alleviated any prejudicial effect, this Court will not find error requiring reversal. *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003). Moreover, the jury was instructed before their deliberations that "the lawyers' statements and arguments are not evidence." "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Thus, defendant has failed to show the prosecutor's improper argument resulted in any outcome-determinative error. *Carines*, 460 Mich at 763.

(Mich. Ct. App. Op. after Reconsid., ECF No. 10-9, PageID.1249.) Although the court of appeals

recited only state cases, the prosecutorial-misconduct standard it applied accurately tracked the

federal constitutional standard.

---

[1] The Court observes that, notwithstanding the Sixth Circuit's continuing application of its own precedent on vouching, *see Wogenstahl*, 668 F.3d at 328-29 (citing *Johnson v. Bell*, 525 F.2d 466, 482 (6th Cir. 2008)), the Supreme Court has not directly held that vouching amounts to prosecutorial misconduct. Given the Supreme Court's recent admonitions to the courts regarding the limits of clearly established general principles, it is doubtful that vouching has been clearly established by the Supreme Court as a due process violation. *See, e.g., Lopez v, Smith*, 135 S. Ct. 1, 3 (2014) (holding, with respect to a claim of self-representation, that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced.'") (quoting *Marshal v. Rodgers*, 133 S. Ct. 1446, 1450 (2013); *White*, 134 S. Ct. at 1703 (same, respecting a claim regarding the privilege against self-incrimination); *Parker*, 132 S. Ct. at 2155 ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here.").

The state court acted reasonably in rejecting Petitioner's claim of prosecutorial misconduct.  First, although the Michigan Court of Appeals found no evidence to support the prosecutor's statement that KN told a consistent story, my review of the evidence reveals that the statement was, in fact, partially supported by evidence and reasonable inference.  While it is true that none of KN's prior statements were introduced at trial, at least some evidence of consistency was introduced through the evidence of the nurse examiner, Martha Denney.  Denney testified that, based on her review of the injuries to KN's hymen, the trauma causing the injury occurred before KN experienced her first menstrual cycle, because otherwise the production of estrogen would have allowed the hymen to be more flexible and unlikely to tear so badly.  (T. Tr. II, ECF No. 10-4, PageID.784, 790.)  Further, defense counsel elicited testimony from Denney that KN had reported a "prepubescent sexual assault" and that her first menstrual cycle began at 10.[1]  (*Id.*, PageID.787, 789.)  These facts corroborate that KN told a consistent story about being under 10 years old at the time of the first assault.  Prosecutors "must be given leeway to argue reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)).  As a result, the prosecutor's argument was at least partially supported by the record and did not appear designed to suggest that the prosecutor had evidence unknown to the jury.  *See Francis*, 170 F.3d at 551.

Second, the prosecutor's comments were of limited duration, especially when viewed in relation to the five-day trial.  *See Young*, 470 U.S. at 11-12 (reciting factors); *Darden*, 477 U.S. at 181-82.  Relatedly, the rebuttal argument was itself responsive to the argument by defense counsel that the jury should conclude that the investigation of the case had turned up no

---

[1] KN testified that she did not, in fact, get her first period until the age of 12.  (T. Tr. II, ECF No. 10-4, PageID.620, 758.)  Regardless of when KN first menstruated, Denney's evidence corroborated KN's testimony that the first sexual assault occurred when she was nine, before she had begun to menstruate.

evidence to support KN's statements, because the prosecutor had not called a police witness or even had such a witness present during the entire trial.  (T. Tr. IV, ECF No. 10-6, PageID.1163.)  While improper, the prosecutor's comment was invited by the defense suggestion that a law enforcement officer should have testified about what he had learned from KN, which the prosecutor indicated would have been hearsay.  *Darden*, 477 U.S. at 181-82.  Because the comments were of limited duration and invited by defense counsel's own arguments, the factor cuts against a finding of a due process violation.  *Id.*; *Young*, 470 U.S. at 11-12.

Third, defense counsel made no objection to the comments.  As a result, the court was unable to timely strike the argument and specifically instruct the jury on the specific issue.  Because an instruction would have cured the error, the factor therefore cuts against a finding of constitutionally significant prosecutorial misconduct.  *Young*, 470 U.S. at 11-12.

Fourth, the court instructed the jury, both at the beginning of trial and during final instructions, that the statements and arguments of the attorneys did not constitute evidence.  (T. Tr. I, ECF No. 10-3, PageID.528; T. Tr. IV, ECF No. 10-6, PageID.1193.)  Jurors are presumed to follow their instructions.  *Richardson v. Marsh*, 481 U.S. 200, 211 (2000).  This factor therefore counsels against a finding that Petitioner was deprived of due process.  *Darden*, 466 U.S. at 182.

Finally, the KN's testimony was detailed and unwavering, despite extensive and hostile cross-examination, and she did not exaggerate.  Her testimony, taken as a whole, was highly credible.  In addition, KN's testimony was corroborated by that of Nurse Denney concerning her injuries.  Further, defense witnesses LoBretto and Allers were shown to be biased, provided dubious testimony, and were of limited credibility.  And, finally, the prosecutor's experts, Denney, Black-Pond, Gunhurst and Henry, were significantly more qualified than

defense experts Okla and Guertin and gave notably more nuanced and credible testimony. As a result, although the case depended heavily on KN's testimony, the overall evidence of guilt was substantial. *Young*, 470 U.S. at 11-12.

Considering all of the circumstances, Petitioner fails to demonstrate that the prosecutor's closing arguments amounted to prosecutorial misconduct, much less that the state court's rejection of his prosecutorial-misconduct claim "'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Parker*, 567 U.S. at 47 (quoting *Harrington*, 562 U.S. at 103). The state court's rejection of Petitioner's prosecutorial-misconduct claim therefore constituted an entirely reasonable application of clearly established Supreme Court precedent.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, I have examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

### **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied.

Dated:    October 15, 2018                              /s/ Ray Kent
                                                        Ray Kent
                                                        United States Magistrate Judge

### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).